Carnegie Mellon University, Ltd Good morning, Your Honours, and may it please the Court, Kathleen Sullivan for Marvell. We respectfully urge the Court to reverse the judgment below because CMU's patent claims are invalid as anticipated by Wurstel and because Marvell does not infringe them. Alternatively, we respectfully request that you at a minimum remand for a new trial on damages because no reasonable jury could have found that 50 cents a chip on worldwide sale represents a reasonable royalty for any domestic infringing use of CMU's claims. I'd like to cover invalidity very briefly, if I may. It boils down to two very simple points, Your Honours. Wurstel anticipates both limitations in the CMU claims. The key limitations are that there be a set of signal-dependent branch metric functions and that the applied creates plurality of signal samples. You need look no further than the plain language of Wurstel to find both of those limitations disclosed. I respectfully refer you to Wurstel column 10, line 52. That's where you get the set of signal-dependent branch metric functions. That seems for all the world to say that there is a single standard deviation-based number. Doesn't matter whether it's squared or not because I don't care about that. I'm going to assume here that set actually means plurality rather than a trivial set. So how have we gotten to two? Greater than, Your Honour. The disclosure at line 52 is that the fraction derived from sigma will be greater for the one branches than the zero branches. That means there's going to be two equations. It doesn't matter if you multiply the zero branches by one. That may mean that you are selecting among functions based on a signal. That doesn't mean that what you select in the zero branches is a signal-dependent metric. It seems to be, and I think this is the idea in the testimony, that you select for the zeros a non-signal-dependent function, the equation 20, which is not signal-dependent. I think your own witness said about four times. And you select for the ones something that is signal-dependent, but because it's constant, it doesn't vary from time slot to time slot. But, Your Honour, what column 10, line 52 discloses is that there will be a difference between the function for the one branches and the zero branches. And if I could refer, Your Honour, in column 10, equation 20 is the starting point, but column 10 asks that you further modify. What Werthel does is he further modifies the modified branch metric function. By multiplying by some number dependent on the standard deviation. Yes, Your Honour, but the standard deviation expressing the transition noise is going to differ between the zero branches and the one branches. And it's that that produces the plurality and is the set. The fraction, it doesn't matter if you keep the zero branches constant or multiply them by one. The comparison to the one branches is going to yield two different equations, two different functions. Because the sigma fraction is going to differ for the one branches and the zero branches. Your Honour, as to the plurality, that's our argument. We would just respectfully suggest that CMU's own expert conceded both that transition noise is a form of signal dependent noise. And that the column 10 discloses a set. All he disagreed about is whether both equations in the set were signal dependent. We believe that's impossible to argue when he's conceded that the transition noise, which is measured on both branches, is signal dependent. So, Your Honour, that's the invalidity argument. Just to be clear about one thing. You're not suggesting that the sigma referred to, I guess not by letter, but standard deviation in column 10, is one that is being updated over time. It is, in fact, the same number that is being used as a multiplier against the equation 20 everywhere you have a one branch. Correct, Your Honour, but the difference is between the one branches and the zero branches, and that's the set. And, Your Honour, as to plurality, again, it's simple from the plain language of the patent column 12, beginning at lines 48. The modified metric, and by this he's referring to the further modified metric, takes into account not only a presently sampled input signal, but a previously sampled signal as well. So, Your Honour, on invalidity, we respectfully suggest that it was not a matter of a battle of the experts. The plain language of Wurstel, coupled with McLaughlin's admissions with respect to Wurstel, makes a case for invalidity. If I could just stay on Wurstel for a second. It talks about transition noise. What do you understand transition noise to mean? We understand it to mean signal-dependent noise. Let's just talk about this back and what Wurstel means when he's talking about transition noise. Is that talking about when you go from a first bit to a second bit? If you flip the plurality on the second bit compared to the first bit, then there will be some resulting noise at the transition on the flip of the plurality? Yes, Your Honour, and where there's no transition, the noise will be different from the noise when there is a transition. I guess I'm wondering why is that signal-dependent noise, based on the claim construction provided for signal-dependent noise, which was a noise structure attributable to a specific sequence of symbols, e.g. written symbols. So, why is the flip of plurality between two bits the same thing as a specific sequence of symbols? Because the transition or no transition is expressed in a series of bits, ones and zeros, and we believe those are covered by the term symbols. But why is symbols the same thing as bits? Because when I look at the 839 patent and I try to understand what the disclosure says, it repeatedly makes reference to symbols and written symbols with reference to these funny symbols that say plus, plus with a circle around it, minus, minus with a circle around it. And so, what the 839 patent is telling me is that when it's talking about a specific sequence of symbols, it's talking about those particular pluses and minuses which represent transitions between two different bits. So, now I'm beginning to wonder if the best understanding of the claim construction is it's referring to a noise structure attributable to a specific sequence of transitions, and what Wursel is trying to remedy is noise at a single transition. So, do you see why I'm now seeing that there is daylight between Wursel as disclosed on its face, in my understanding of what is being claimed when the claim references signal-dependent? Jan, I do see your point, but the claim construction did not construe a symbol as narrowly as you described. And there's nothing to suggest that the transition noise equations that are disclosed in Wursel don't themselves embody a sequence of symbols because the bits represented by one and zero on the transition branches and the non-transition branches, we think that does fit within the term symbol as construed. Dr. McLaughlin talked about how all Wursel has is a single transition, and that's not the same thing as a specific sequence of written symbols. And I didn't see anything by Dr. Proakis countering that by saying, well, Wursel is really more than just about a particular transition of a flip of plurality between two bits. It could actually be more expansive than that, and that's really what Wursel is contemplating. It's contemplating a sequence of transitions which would require more than two bits. It would require at least three bits. Your Honor, that is a possible reading of Wursel. But at a minimum here, our interpretation of Wursel renders the willfulness judgment here inappropriate because we certainly have an objectively reasonable defense because there's ambiguity in the term symbol and because we reasonably believe that there was a set of signal-dependent branch metric functions and we reasonably believe that it was applied to a plurality of signals. And the further details of the CMU patents are not necessarily relevant to the particular claims at issue here. There may be other differences between Wursel and CMU. In fact, Wursel himself said there might be some differences. But the claims here are really quite simple, and a set of signal-dependent functions and plurality of signal samples we think are covered by the claims here. What do you think Mr. Wursel meant when he said that this work by Kavchick goes above and beyond Wursel's own work? We don't know, Your Honor, but as narrowed for trial, the covariance matrices dropped out of the case, and to the extent that covariance matrices were what CMU pointed to as part of the complexity of their analysis, that may have been what he was referring to. He hadn't fully reviewed the work at that point. No, Your Honor. He had just reviewed the disclosures. So, Your Honor, if I could, because I really do want to focus on the damages issues in the case, be extremely brief about non-infringement. Again, I want to suggest that at a minimum, we had an objectively reasonable non-infringement defense. I'm sorry, just real quickly, one last quick question on validity, and maybe I didn't catch it in your first colloquy with Judge Toronto. What is... Oh, I'm sorry, you go ahead. Well, Your Honor, non-infringement, very quickly. The MMP chips perform the analysis in a post-processor, not in the trellis. You might say, why does the analysis have to be in the trellis? The answer is the court's construction to the CMU stipulated of the term branch, which modifies both branch metric function and branch metric value. Am I remembering right or wrong that there was a quite substantial dispute in the claim construction process about whether the post-processor was going to be excluded or not, and the court ruled against Marvell and for CMU. In what way are you making a point different from what was rejected? Your Honor, simply that to include the post-processor in the application of the function is incorrect under the stipulated claim construction about branch, because branch is defined as a transition between two nodes of states in a trellis. And that's confirmed, of course, by Kapchick's admission that his claims operate in the trellis and not in the post-processor. So, Your Honor, however we draw the line around the thing that is doing the detection, we think the application step has to be performed in the trellis by virtue of the claim construction of branch. On the NLD chips, the argument is very straightforward. CMU's claims both require application to a plurality of signal samples. Our branch metric function, which is in the chip stipulation, so it's part of the technical documents that are binding in the case on both parties, applies the branch metric function to a signal-signal sample that's outputted by the pre-filter, and that's represented by the parameter f sub y. So, no plurality there. And finally, on simulations, Your Honor, we would respectfully suggest that simulations are not covered by the claims. If you look at the... Can I just ask you about that? It seems to me that the patent itself makes clear, contrary to a kind of ordinary English reaction to the word detector, that this is not a sensor of the magnetic properties of the hard drive. It is, in fact, a data detector, which is why it's separated from the sensor in Figure 1. At which point, if... And I gather there's evidence of this, that you get data from actual hard drives and then feed it into the processor, the Viterbi-like processor. It doesn't matter whether you call that a computer or not, it's still a relevant detector because it's detecting the data by running a process to figure out what the true bits were. Correct, Your Honor, but in real time. And, in fact, the opening of the 839 patent, it says the patent is directed to high-density magnetic recording sequence detectors. And other aspects of the claims that we detail in the brief refer to the notion of a real-time hard drive data detector, not a simulation using a computer. And the admission, again, of CMU's own experts confirms that reading of the patent because McLaughlin admitted that the detector is in the chip. And we further suggest that if CMU now wants to say, well, this is just an algorithm, it would run into Alice problems because if it's just a patent-ineligible mathematical equation that doesn't have a structure, we think it would run into problems of eligibility. But, Your Honor, I would like, if I could, because they're complex, to spend the rest of my time on the damages issues. And I'd like to begin by simply, let's break it out into the base and the rate, and let me begin with the problems with the royalty base. And I'd like to begin with the instruction because that's what we think is the root of the problem here. The judge instructed the jury that it was entitled to include as a proxy for the domestic infringing use all sales, including all foreign sales, all sales of chips manufactured, sold, and used abroad, all sales, including foreign sales, quote, resulting from Marvell's alleged infringing use during the sales cycle. Now, the problem with that instruction... Wasn't there another place in the instruction that said that you can't award damages based on the foreign sales? That's correct. In the preceding sentence, Your Honor, the court instructs you may not award damages on the basis of the foreign sales, but it goes on to say you may consider all sales resulting from Marvell's alleged infringing use during the sales cycle as a means of valuing the domestic infringing use. So she says you can't literally award damages for the foreign sales, but you can use foreign sales as part of the royalty base for creating this proxy for the valuation of the domestic infringing use in the sales cycle. Now, there's two problems with this, Your Honor. I'd like to start with the first problem. By including foreign sales at all, we believe it violates the long line of precedence by which this court and other courts have said, as a matter of law, that you may not recover U.S. patent damages for foreign sales. It doesn't matter if it's direct or indirect. If they're in the base, they're being used as a basis for calculation here, and obviously there... By the way, do you generally agree that the law is different in the copyright world? I can't speak to that, Your Honor. I thought there were quite a number of cases cited, Fourth Circuit, Second Circuit, Ninth Circuit, others that allow the use of foreign sales to calculate copyright damages for domestic activity as long as the former follows the law. So, Your Honor, the argument in the patent context is that the territoriality principles of patents law, which may well be different from that for copyright law, requires that a U.S. patent rights holder does not obtain, in a sense, the value of a worldwide license. Now, I want to just say that there isn't a single case that CMU can cite in the patent context as opposed to the copyright context that suggests this kind of fruit-of-the-poisonous-tree theory that lets you get out and reach out to the foreign sales. And power integrations is just the latest statement of this. Power integrations obviously has some differences from this case. That's right. That's what I'm wondering. Is it likewise true that there's no case that's kind of back-and-forth going the other way in your favor? I feel like we have here something of an in-between case. I agree, Your Honor. I think there is no clear case either way. And what we would respectfully suggest is that you should make clear in this case that the principle of power integrations, which, of course, expresses a long line of territoriality cases in the patent context, requires you to send the case back for a new trial with an instruction that excludes the foreign ships from the royalty base. Now, let me say why. I think the closest case to our side is power integrations. And I think the reason for that is power integrations obviously involved an apparatus patent where sales were potential acts of infringement, where a method patent, the infringement here, is used. That, in our view, makes no difference because what this Court rejected in power integrations was the idea that near-proximate causation or reasonable foreseeability was enough to allow the patent holder to reach out into foreign jurisdictions and include the foreign ships in the base. We think what happened here is even worse. Power integrations at least involved a proximate causation notion about reasonable foreseeability. Here, the instruction is just a but-for causation instruction. It says you, the jury, can use foreign sales as a proxy for domestic infringing use if they resulted from. There's no qualification. If they resulted from, there's no definition. And that's the second error here, Your Honor. Can you explain what's the nature of these sales cycles? If you win a sales cycle, does that mean that you and your customer are essentially attached at the hips for the next four or five years and are going to be making billions of dollars together? I mean, how does this exactly work? What are they agreeing to when there is a sales cycle win? Your Honor, the answer to that question is the record does not say. The record does not say for a very basic reason. We sought at many points pre-trial and during the trial to exclude evidence of foreign sales as part of the royalty base. That was denied, and the court repeatedly ruled both in pre-trial motions, motions in limine, and in response to our trial objections, that all sales, including foreign sales, could come into the case. So there was never an opportunity for the jury to decide what does a sales cycle mean, where did the sales take place. There was never any joining of issue on that because the court's instructions precluded a definition of the sales cycle or a definition of where the sales took place, and that's an additional reason for you to remand. There was lots of talk about design wins. There was, Your Honor. When a design win occurs, is there a contract? The record does not say, Your Honor. There was no evidence in the record that established where contracts were signed. Never mind where. Is there a contract? When Seagate agrees with Marvell, we're going to use your chip. Is that embodied in a contract? Yes, Your Honor. But the evidence in the record... And what is the... Is it a requirements contract? Are there minimum numbers? Your Honor, I can't answer that because it's not in the record, and I think this is one of the central reasons why you need to send it back. I mean, I could try to, you know, give you answers from personal knowledge, but that isn't the point. The point here is that the record does not have any evidence of what sales cycle means, where the contracts took place, and as this court made clear recently in HALO, a mere offer in the United States is certainly not enough to establish that a sale took place in the United States. You might want evidence about where contracts were signed, where sales were made. So, Your Honor, there are two separate problems with the instruction. One is it included foreign sales. You have repeatedly said as a matter of law that foreign sales can't be the basis for determining a royalty base, and you asked what case we had. The closest case for us is power integration. The only case for them, Your Honor, is railroad dynamics, and we think that railroad dynamics is a case that allows the inclusion in a royalty base of some foreign sales in the world of car sets containing infringing snubber components, but it does so in the only context in which you have ever proved the use of foreign sales as part of the royalty base, and that is where the infringing car sets were domestically manufactured and the manufacturer was the infringer. If the underlying concern about extraterritoriality as a common sense matter is trying to prevent duplicative regulation, why doesn't the railroad case present exactly that problem? The making and the selling, where the making is here and the selling is abroad, and the two countries may have quite different regimes or even the same regime and want to tax it twice with damages, and yet that's okay. It does present it, Your Honor, and we don't necessarily believe railroad dynamics would survive this court's approach in power integrations, which suggested that the extraterritorial principle should trump the principle of fair compensation and for the reasons that you described. So I'm not suggesting railroad dynamics is correct. I'm just saying that to the extent it's still good law, it doesn't apply to our case because in our case you've got a long attenuated chain of causation between the domestic act of infringement, the use of demonstrationships and simulations and static fire to create a relationship that becomes contractual at some point not specified in the record. That's very different. There's a one-to-one correspondence between the infringing manufacture and railroad dynamics and all the other cases that CMU has cited for this principle and the current challenge. Are you suggesting there are lines where there's a fail cycle win that ultimately is a breakdown on the way to ultimate sale and manufacture and incorporation of the chips? We do, Your Honor. It's undisputed in this case that the chips are all manufactured in a factory in Taiwan that was conceded by CMU's own expert. We also believe that when power integration said that the act of foreign sale, manufacture, or use creates an intervening cause that breaks the chain of causation, there is a real problem with this kind of case. The reason why the car set might be understood as an acceptable proxy is that the car set is not a consequence of the infringement in the United States. It's literally a measure on a one-to-one basis of the infringement in the United States because the thing is completed before it leaves our borders. We think that our case is dispositively different from railroad dynamics and it would take a new carve-out from the territoriality principle for this court to affirm. I see my time is nearly up. I wonder if I could switch to the royalty rate and just briefly make a few quick points. I'm sorry, Your Honor. On the base, there may be one more thing just to see if I can interrupt myself. On the base, I made the argument about what's wrong with the instruction. It includes foreign sales and the resulting from the but-for causation piece is undefined. The court compounded the error by not saying what the sales cycle means and the parties were precluded from including evidence on where sales took place, an additional reason for remand. But on the base, I just want to say why a reasonable... I'm sorry. I just want to follow up on one thing though I'm not sure if it matters. I was not seeing a preclusion of evidence on the question of where the sales took place. Actually, Your Honor, the district court... There was a nominal summary judgment in which I think I forget the citation. I thought the district court said near the end this question is an issue for trial. The district court repeatedly said I'm letting all sales come in regardless of place. And we regard that as effectively precluding and rendering futile. Oh, you're equating those. Yes, we are. Okay, I'm not sure I would... Okay, go on. Fair enough, Your Honor. On the base, just one last quick point. Even if you think this instruction is acceptable, we don't. We think you must remand for a new trial giving clarifying principles about foreign sales and the causation standard. No reasonable jury could have found that the foreign sales would have been included in a hypothetical negotiation in this case. So just on the record here, three quick points. The parties must be assumed to bargain in the hypothetical negotiation in the shadow of the law. CMU had no evidence of any analog foreign patents here. So CMU was not in a position in the hypothetical negotiation here to bargain for a worldwide license. Second quick point, there was no industry practice data or any other real world data point in this case whatsoever to suggest that percentage of worldwide sales was ever the kind of license given in this industry for this kind of venture project of a university. To the contrary, as I won't belabor, all of the real world evidence in this case, such as the $200,000 a year offer... It does have this seemingly quite appealing economic rationale of everybody getting money if the thing turns out to be a success and you're getting basically three quarters of it and they're getting one quarter when the alternative is maybe much, much worse for you. Your Honor, there's no evidence Marvell would have signed a license that's 600 or 6,000 times more expensive for us than it could have gotten by joining the DSSC or taking the deal offered to Intel or taking the deal, the $2 million annual deal that CMU said post the date of the trip cycle negotiation, 2004, 2005, that CMU said a great optimistic scenario would be $2 million from Marvell. So there's no evidence that the willing licensor here would have contemplated this license. And there's no evidence that the willing licensee here would have contemplated it because if Marvell was faced with paying 600 or 6,000 times the nearest historical license, it could have moved offshore for the trip cycle. Your Honor, I see I'm almost out of time for my rebuttal. On the rate point, we've covered it in our brief, but I can cover it briefly if Your Honor wants or I can save it for rebuttal. What about, just if I could move on or go back a second, so you're basically saying the hypothetical negotiation would be restricted to actual US usages and sales. Yes,    to a calculation that resulted in something like 556 million chips making it back to the US for the trip cycle negotiation and then going back to the US for the trip cycle negotiation and then  on the US shores. Yes, Your Honor. So, I guess that would be something that you would agree is an infringement. Well, I don't agree with that, Your Honor, but first may I ask, Your Honor, may I preserve my rebuttal time if I answer Judge Chen's question? We'll give you two minutes. Okay, thank you. The answer to that, Judge Chen, is we don't concede that if the sales cycle begins in Santa Clara, the manufacturer and sale occurs abroad and the chips come back into the United States, we don't concede that that necessarily is a proper piece of the royalty base. We don't concede it because there's been intervening causes. But, Your Honor, on this record, there was also a contributory and induced infringement verdict and so the notion that the chips that come back into the United States might be fairly encompassed by a secondary liability theory might allow you to sustain that piece of the verdict. But then, at most, the liability would be for the domestic, the chips that come back into the country. We don't think the evidence on that was proper. It was based on industry-wide PC data  specific to Marvell. There's a lower number that's more data specific, 329 million chips. But, Your Honor, we don't concede, of course, that it's necessarily proper. You'd have to ask, is that the direct and immediate result? Do we want to extend causal chains that far to include it for direct infringement? So, to summarize, we don't concede on direct infringement. You might sustain those chips here if you had a contributory or induced infringement theory. But, Your Honor, last one on rapes. We said in our brief that the rapes are abusive. Thank you, Your Honor. If I have things to address in the race, I'll thank you very much, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Josh Rosenkranz, representing Carnegie Mellon University. Your Honors, if I may, I'd like to take an unconventional approach and begin with damages first and then circle back to the merits    all up in one package, this case truly is a case of rapes. It's not a case of rape. It's a case of  alternatives. This is extraordinary, but not for the reasons that Marvell has recounted. You almost never see copying as blatant or as reckless as this. You almost never see a case where the accused infringer has admitted and never argued that it has anything by way of a non-infringing alternative. You almost never see such a stark before and after picture of a company struggling in a life and death struggle about to go out of business and then rising to the top of the market where the company itself says that the reason is this particular invention. But on the damages point, in particular the extraterritoriality point, that point at least, I take it to be independent of any questioning of the tightness of the causation from all of the activity in Santa Clara and Taiwan and other places that the company  involved in. So why is it that even if your basic narrative is accepted that the alternative to infringement  Marvell going out of business and the amount of 25% of their multi-billion dollar profit resulting was a reasonable price to pay, nevertheless the extraterritoriality argument is you've reached too far. I understood your honor. And actually the narrative links directly to extraterritoriality. Not just was it necessary for Marvell to infringe to save its life. It was necessary for Marvell to infringe in Silicon Valley. That was part of the no non-infringing alternative. And that makes this case the diametric opposite of power integrations. In power integrations there was absolutely no linkage between the domestic act of sales and the foreign sales. I thought I read power integration differently. Where the opinion at least rejected the theory of awarding damages on foreign sales that were connected to or related to or caused by domestic infringement. No your honor. Actually the word was foreseeable. I mean it was a completely crackpot theory of damages in that case. There were domestic sales. And the plaintiff said because it was foreseeable that there would be foreign sales we get to claw back the lost sales that we would have made in foreign territories. And this court went out of its way to say that the expert admitted that his opinion was correct. So to segue back to judge Toronto's question, here we have that definitive linkage. This may be the unique case where that linkage is very clear precisely because here is where the sales force was. Here is where the design force was. 150 design employees out of 153. Here is where the customers and their design centers were. They had no choice but to be infringing for trillions of times per chip over the course of millions of chips hand in hand over the course of several years for each design win. In the red brief you described the design force. The answer to the first question is yes. Every other chip in a hard drive has it according to our industry expert. It has become industry standard. Everyone is asking for it. The second question is no, we haven't sued. It was a big lift. We have to get their documents to figure out the nature of the infringement. I want to turn to  Chan's question about what the record says about a design win. It supplies the rest of the nexus. It is a winner take all market. On page 42, 124, you have a clear quote from our industry expert that says when you win, you get all the chips on the drive in that generation. He says he has never heard of a case where some other chip gets put into the drive once you get the design win. It is like a requirements contract. We don't have a record that   you win, you get  chips on  once you get the design win. It is like a requirement contract. We don't have a record that says when you win, you get all the chips on the drive once you get the design win. It is like a requirement contract. We  have a the drive once you     like a requirement contract. We don't have a  says when you win,   chips on       don't says when you win,  get all the drive  like a requirement contract. We don't have a record that says when you win, you get all the drive once you like a  contract. We don't have you win, get all  drive once you it is true that the defendant's bad conduct, inequitable conduct, can count against latches, but only if it is in some way responsible for the patent holder's delay. We don't have that. inequitable conduct, but only if it is in some way responsible for the  holder's delay. We don't have that record.  don't have a record that says inequitable conduct, but only if it is in some way responsible for the patent holder's delay. We don't have a record that  inequitable conduct,  if it is in  way responsible for the There's a second Viterbi detector. It's going on in there, but it's not going on in the M&P. No. I'm talking about what's happening in the M&P. There's a second Viterbi detector with a second trellis. It's called a pruned trellis. It's not  in the M&P. As to validity, Marvell's position was dependent upon rewriting a formula that our experts said is ridiculously misleading, rewriting it in a way that contradicted the plain language of the very column. Just to check my understanding, the M&P was not using a variance instead of the standard deviation, but putting the index in the subscript to suggest that it was differing from time to time. Absolutely. The subscript is really small and really hard to see, but it didn't put one over on the jury or district judge. It is incredibly important. In column 10 it begins by saying on line 26 that sigma squared is a constant. It is 0.055. It could be something else, but it is a constant that he describes. He goes further down in column 10 and refers to it as a constant. It is not different from branch to branch. I have to emphasize that in column 10 at the bottom of the bottom paragraph, line 55      It is talking about the standard deviation, that being a fraction. It is not a constant. It is 0.055. It is 0.055. It is    It is 0.055. He is talking down here about each branch of the metric. It is the same branches. They are all being multiplied by the same number. You can choose a number that is different from 0.055. It is the same number for every branch. I have to underscore that Ms. Sullivan changed the theory. The first line was column 10, line 26. This is in the unfurther modified example, right? Yes. That is the standard deviation. Standard deviation is a fraction. When you go down to the further modified, he is talking about the standard deviation. It is further modified by multiplying by a scalar. It is a fraction. It could be sigma squared for all we care, but it is the same fraction every time it is multiplying. I do want to underscore that the theory of infringement changed today. There are two equations. There is equation 20, and there is the equation 20 that is multiplied by a constant. There are two different equations, arguably. Marvell admitted in the district court that equation 20 is not signal dependent. Our whole argument was that if equation 20 is not signal dependent, you cannot make it signal dependent by multiplying it by a fraction. Marvell's entire theory was no, no, no. It is the further modified equation. That is the one that represents the set, precisely because of this B comma NT. That is the set. Ms. Sullivan said no, that equation 20 is not the set. The set is equation 20. That is one element of the set. The second element is the further modified. Which one you choose depends on the particular value, whether it is a transition or not. Which one you choose depends on whether the selection is signal dependent. A transition is not the same as a sequence of symbols. You can tell that there has been a transition. Is that a different point? I thought you disagreed even assuming that a particular transition is a signal and a function that you apply when you have that signal is signal dependent. Even if you assume that when you apply exactly the same thing to all of the transitions and don't to the zeros, the choice based on signal does not make what you choose into something signal dependent. At the end of the day, you still have just one signal dependent function. It is also an additional argument, which is being able to detect a transition, which is what in column one is described as the prior art which is no good, that is not the same as being able to detect a sequence of signals. Being able to detect whether it is a transition only tells you whether it doesn't tell you whether it is a transition. The other argument is that the district court's unappealed claim construction was that the signal dependent branch metric function has to be able to determine the sequence of signals. You have been very patient and we respectfully request that this court affirm the district court in all respects. I'm going to give you six minutes. Thank you, Your Honor. Thank you. Judge Taranto, you asked, my friend, if you corrected the erroneous instruction and sent the case back for remand, could a robust record be joined on the meaning of sales cycle and the answer is absolutely yes. It could be and has been in post-Marvell cases. There was no evidence to support my friend's assertions about sales taking place in the United States or a sales cycle necessarily being located in the United States. There are plenty of testimonies that said the negotiations took place, the design wins, the point that Mr. Rosenkranz pointed us to a little while ago that said once you have one of these, all the chips are bought from the same source and what was no evidence was anything to the contrary from your side. The instruction kept the jury from deciding where the sales were located. What I'm suggesting is a properly instructed jury. You can't accept the trial record or its omissions without a proper instruction that gets the jury to see the relationship between any sales. In real life, in fact, the contractions in Santa Clara are subject to a lot of other contingencies. My key point is the instruction was arranged and I want to go to the point about Mr. Rosenkranz said we didn't object to the extraterritorial chip and the weak standard of causation. In this case, it was Marvell of course to prove the damages. We were not given an opportunity to debate where the sales took place. Your Honor, Judge Chen, you asked my friend, wouldn't AT&T versus Microsoft mean that if it was redone as a reasonable royalty case, all the foreign window sales would come in. The answer is absolutely yes. He tried to say this is a causal nexus case. That's not true. The golden source was of course related to all the foreign sales. He proved our point. If reasonable royalties could bring in foreign sales, where is the evidence that the licenses were comparable? There is none. Our damages expert said all were agreed. The comparable licenses were flat feet. The delta is 600 to 6,000 times the jury verdict. Surely the licenses are probative of the unreasonableness of the jury award. And finally, sorry, two more quickly, your  You gave me six minutes. The latches point, your honor. We do think latches under the court's current law warrants vacater here. This is a rare case in which her ruling was vacater under current law. Although not in the latches ruling, I think later in time, the district court said the only reason I denied latches was willfulness. In your view, latches falls  willfulness? Absolutely correct, your honor. And if you look at her opinion, she says the only reason I'm sorry, for a remand, that is, the district court might well, if the latches doctrine survives, still be the    sorry, for a remand. I don't think you get into a judgment of no pre-suit damages just because the district court said my reason was dependent on willfulness. If you took that out, the district court could come to the same conclusion  different basis, possibly. That is possible, your honor, but we suggest you remand because she found all elements of latches. The district court found that  latches should still go out because she found all the elements and her your honor, let me explain. Your honor, let me explain. We believe we have an independent basis to throw out latches because egregious conduct must cause the delay. And she found as a finding that our supposed copying did not cause any delay. Your honor, we think if that's in doubt, the proper remedy is remand here and let her see if she can come up with